[No. 2396.]

Ex parte John Allen.

HABEAS CORPUS—MURDER—FACT CASE.—See the statement of the case for
evidence adduced in a *habeas corpus* proceeding for bail under a charge
of murder *held* not to authorize the refusal of bail.

HABEAS CORPUS on appeal from the District Court of Lime-
stone. Tried below before the Hon. Sam R. Frost.

The relator in this proceeding was held under an indictment
charging him with the murder of one Cicero Brown, in Lime-
stone county, Texas, on the tenth day of June, 1886. The result
of his appeal was the reversal of the judgment refusing bail,
and the award of bail in the sum of five thousand dollars.

Eli Robertson was the first witness for the relator. He testi-
fied that he knew the deceased prior to his death, and had
known the relator about three years. The relator and the wit-
ness lived on the same place during the year prior to the year
during which the relator lived on the place of the deceased. On
about October 30, 1885, the deceased came to the house of the
witness while relator was there, and wanted the relator to move
at once. The relator objected to moving at that time, assigning
as the reason that he had no corn. Deceased replied that the
need of corn was not a good excuse; that the relator could use
his (deceased's) corn, keep an account of it and return it. Rela-
tor agreed, and moved at once to the place of the deceased. A
week later the relator took a wagon load of his own corn to the
deceased's place. On the Sunday before the Thursday of the
affray, the witness saw the deceased at church. He called the
witness from the church and told him that the relator had traded
him a mortgaged horse, and that if he did not straighten that
transaction he would send the relator to the penitentiary; that,
if he failed to "get" him on the horse transaction he would
get him about the corn; that he was going to have relator arrested,
and that, as relator could not give a bond, and as he did not pro-
pose to lose his rent, he was going to hire some one to gather
the relator's crop. The deceased said at the time that he wanted
some body to hear him talk to the relator, as he proposed to

curse him for every thing he could think of. The witness expostulated with deceased, advised him against the course suggested, as it would get him into trouble, and declined to be the party to hear the proposed abuse. Deceased replied that witness was wrong about the trouble, as the relator would not dare to resent what he might say. Witness, acting upon the request of the relator's wife, went to the deceased's house about nine o'clock on the night after the stabbing. Deceased, who was then lying on the gallery, drew a long breath and said: "Will, this trouble is all my own fault." Witness was nearer the deceased at the time than was any body else, and, though the others were but a short distance removed, he was unable to say whether or not they heard the remark. Witness was not related to the relator, but had known him for three years, during which time his reputation for peace and quietude had been good. One of the relator's hands was bandaged when he surrendered.

J. D. Flanagan, the constable of the precinct in which the cutting took place, testified, for the relator, that the latter voluntarily surrendered to him in the town of Marlin, Falls county, Texas. Witness saw the deceased on the Sunday before the cutting and heard him say that the relator had traded him a mortgaged horse, and must straighten up that transaction. During the three years witness had known the relator the latter had borne a good reputation for peace and quietude.

Mrs. Allen, the relator's wife, testified, in his behalf, that on the afternoon of the day on which the cutting took place the relator was in the field hoeing. Deceased passed the house about the time that the witness started to the gate to secure it against some cows. She presently observed the deceased talking to the relator boisterously, and apparently violently. She heard him call the relator a d—d rascal, and tell him to cross the fence, that he, deceased, might have the relator where he wanted him. The witness then went to the pasture after a cow, and from the pasture she saw deceased and the relator when they reached Mrs. Brock's house. Witness was then about one hundred yards distant from Mrs. Brock's house. She heard deceased call Mr. Davis and Mr. Melton. She judged from the conversation, as well as she could hear it, that deceased had attempted to prove something and had failed. She then saw the deceased dismount. hitch his horse, seize a hame and make a mark on the ground, and then heard him dare the relator to cross the mark. She then saw the relator approach the mark, when the deceased struck him three

blows with the hame. Witness then started in a run towards the parties, but the fight was over before she could get across an intervening ravine. Witness saw the relator immediately after the fight. His hand and head were bruised and bloody.

Joe Newman testified, for the relator, that he saw the relator on the same day and very soon after the fight occurred. His left hand and the side of his head were bruised. Witness and his mother dressed the relator's wound.

John Allen, senior, the relator's father, testified that the relator had neither property nor money. Witness had no property above his legal exemptions. Relator had but one other relative in this country—a cousin.

It was agreed that the absent witness, E. Hall, would testify for the relator, if present, as follows: "On the day of the cutting deceased told me that he was going to see John Allen and make him pay twenty-five dollars or surrender his crop, and that if John Allen did not do one or the other he was going to beat him to death." The relator closed.

C. L. Brown, the father of the deceased, testified, for the State, that he saw his son at Mrs. Brock's house about thirty minutes. after he was cut, and was with him almost constantly until he died. He was stabbed on the evening of June 10, 1886, and died at about half past one on the morning of the twelfth of the same month. Deceased undertook to talk to witness on the first night after he was wounded, but witness restrained him, fearing the effect of the exertion. On the next day he told witness that he could not live; that he would unquestionably die. He was perfectly rational, and witness then told him to relate the circumstances of the difficulty. He said: "I was going over to my brother's to sit up with a sick child, and started by Mrs. Brock's to get Flem Davis, who had promised to sit up with me. In passing by John Allen's I saw him in the field, and called him to the fence. He was hoeing cotton. I wanted to talk to him about using some of my corn. Allen came to the fence, and I told him he had been using my corn and that I wanted him to settle for it. He had out his knife and began cursing. I told him that I did not want a difficulty; that Jack Melton said he saw him, Allen, taking my corn, shelling my corn, and taking my corn to mill. Allen said: 'I did not take your corn, and if Jack Melton will say that he saw me taking your corn I will give you my whole crop.' I replied: 'We will go to see Jack Melton, and if he don't say so, I've got nothing more to say

about it.' John Allen then got over the fence and we went to Mrs. Brock's to see Jack Melton. On the way he took out his knife, and wanted me to get down two or three times, to fight. I would not do so, and told him that I wanted no difficulty. When we got to Mrs. Brock's we called Flem Davis, who came out, and I asked him if Jack Melton was in the house. He said that he was, and called him out. I said to Jack Melton: 'We have come here to see about the corn. John Allen says if you will say that you saw him take my corn, shell it and carry it to mill, he will give me his whole crop.' Melton replied that he saw Allen taking the corn, but could not say that he took it to mill. I then asked John Allen: 'What have you got to say to that?' I then told him that I would have him up in town the next day. He said: 'No you won't!' He still had his knife out. I got down and took up a hame to defend myself, and told him not to advance on me. He ran up to me, and cut me with his knife."

Irvine Bryant was the next witness for the State. He testified that he saw the deceased on the eleventh day of June, 1886, after he was cut. He said to the witness: "I am a dead man." He then made to witness substantially the same statement as that detailed by the witness, C. L. Brown, except that he added the following as a part of the deceased's statement: "When Melton replied to the question by me: 'Will you swear that you saw John Allen taking my corn?' he answered: 'I could not swear otherwise,' and I then thought I would not have any trouble with John."

Flem Davis testified, for the State, that he was present and saw the difficulty. Jack Melton, Pete Davis, R. E. Meyer and witness were on Mrs. Brock's rear gallery when deceased and the relator rode up and called the witness. When witness went out to the front gate, deceased asked him if Jack Melton was at the house. Witness replied that he was, and called him. When Melton came out deceased said to him: "We want to see you and settle this business about the corn. John Allen says if you will say that he shelled my corn and took it to mill, he will give me his entire crop." Melton replied: "I saw him shell corn several times, but I can't say he carried it to mill." Deceased asked the relator: "What do you say to that?" Relator replied: "I paid you back that corn, Cicero Brown!" Deceased said: "You paid me one hundred and thirty ears, and I can prove that you got a barrel of my corn at one time, and that you

had no corn from the time you moved to my place until I moved my corn away, which was more than two months, and unless you settle with me for my corn I will have you in town to-morrow morning." Deceased then turned to Melton and asked him: "Will you swear to what you have said?" Melton replied: "I don't see how I could do otherwise." He then turned to the relator and repeated: "I will have you in town to-morrow." Relator replied: "No you won't have me in town to-morrow, Cicero. Brown; no you won't!" Deceased then dismounted, seized a, hame lying under his horse, and led his horse to the fence. Relator, at that time standing still, said to deceased: "Don't you draw that hame on me, Cicero Brown." Deceased replied: "I am not going to draw it on you, but don't you advance on me." Relator replied: "I am not going to advance on you." Meanwhile deceased got his horse hitched. He then drew a line on the ground with his foot and said to relator: "If you cross this line I will beat your brains out." He then took one step backwards and stood with the hame in his right hand, hanging to his side. The two parties were then about ten feet apart. Relator asked: "You dare me, do you? You dare me?" Deceased replied: "Yes, I dare you!" Relator approached the line, and just as he reached it, the deceased struck at the relator with the hame. Relator caught the blow on his arm, and ran upon the deceased and struck him in the side. They clinched at the same time and both fell to the ground, the deceased underneath and the relator on top. The deceased hallooed and relator got up, and, as he did so, he caught the deceased by one leg, held it up and stuck a knife in his thigh. The witness then for the first time saw the knife. Relator then fled about twenty yards, returned to get his hat, and as he saw the deceased on his feet again with the hame again raised, he ran in to him again and stabbed him twice. Witness then appealed to the relator to desist, and the relator ran off. Deceased remarked: "Boys, he has killed me, and don't any of you forget that he advanced on me first." He then asked witness to get him a doctor. Witness mounted deceased's horse and went for the doctor. On his way he encountered the relator, who asked if he had hurt the deceased much. Witness replied that he thought the wounds inflicted were fatal. Witness identified a hame in evidence as the one used by the deceased, and said that it weighed about two and a half pounds, and was a dangerous weapon wielded by a

man.   Deceased was very bloody when he rose from the ground after being thrown by the relator.

Jack Melton, for the State, testified to the same facts as did Flem Davis.

No brief for the relator.

J. H. Burts, Assistant Attorney General, for the State.

White, Presiding Judge.   A mature consideration of the record in this case has led us to the conclusion that the honorable district judge who heard the habeas corpus erred in refusing bail; wherefore the judgment is reversed, and applicant will be admitted to bail upon his execution of a bond with good and sufficient sureties, conditioned as the law requires, in the sum of five thousand dollars.

                                          *Ordered accordingly.*